Thank you. Good morning, Your Honors. I'm Georgia Hind, and I represent the appellant, Jose Hernando Rodriguez, who appeals the District Court's decision denying his 2255 motion, premised on prejudicial instances of his former counsel's ineffective assistance. With this appeal, we ask that the court review two of those omissions. First, the counsel did not challenge the timeliness of Mr. Rodriguez's prosecution on a basis that the District Court considered plausible. And second, the counsel failed to assure that Mr. Rodriguez understood and appreciated the benefits of a plea offer proposed by the government, both by explaining the plea offer to the Spanish-speaking defendant with the assistance of an interpreter, and by persuasively recommending to the defendant that he should accept the offer. Haven't we already foreclosed the argument about the statute of limitations by our decisions in Guerrero and Payne, saying that what matters is that Congress has identified the category of crime as deserving of the death penalty, and the terms of his extradition are irrelevant? Certainly, Guerrero undermined the District Court's conclusion that that would be a plausible argument, Judge. But in this case, and in all the cases, actually, where an offense was considered a capital offense, regardless of intervening circumstances such as, you know, judicial interpretations or punishable of an underlying element and so forth, those are all cases in which the defendant was actually in the United States at the time of his arrest, and the government merely elected not to proceed in a capital proceeding, or perhaps there was not sufficient evidence to do so. But my problem, just a technical problem, is this. That is, if it is not the fact that under the statute he could have been, but the government chose not to, but does depend on the fact that the extradition agreement said he would not be punished, he would not be sentenced to death, if that is the argument, then that argument was not a basis of a COA. Your Honor? And it just wasn't. It has to be a new argument, because that was the argument. The other argument was the argument made below. Now, we can, of course, expand the COA and consider that argument, but I think we have to expand it, because if, as the government says, Guerrero governs, then that's the end of it, and this argument isn't there. Now, if we assume we do expand the COA, then we can consider that argument, though we don't need to, and at that point I must say, why should that make any difference? The statute of limitations refers to behavior, to acts which are punishable by death, and whether the agreement not to do it is a prosecutorial decision or a contract between the United States and Colombia, I don't see that ultimately that makes a difference in what the statute of limitation was saying, that there are certain behaviors as to which we don't want a statute of limitation. I understand, Your Honor. First, I do request that the Court expand, with its discretionary powers to do so, the COA, to reach this issue, which is basically a question of law. And second, the reason that the extradition factor in this case should distinguish it from the Guerrero situation is that but for the government's agreement not to prosecute a capital offense against this defendant, it could not have exerted jurisdiction over him at all. It's a threshold that, unlike in other cases where you have the government choosing not to proceed in a capital proceeding, that's an after the fact. Was he indicted prior to the extradition? Was he extradited after he had been indicted? He was indicted in 2005, and the extradition did not occur until, I think, late 2006 or 2007. So what you're telling us is the indictment was timely when it was filed, that it was timely then. Well, not within the five year. You're saying it was timely when it was filed. You don't have any argument that the indictment wasn't timely when it was filed. There hadn't been any agreement by the United States not to put him to death when the indictment was filed. So you're saying it was timely when it was filed, but it suddenly became untimely when the United States agreed that it wouldn't put him to death. I think it changed the character of the charged offenses in the indictment, Your Honor, at the moment that the government could only prosecute him under an indictment that was timely if all other factors were resolved in the government's favor. If he had sent a lawyer saying, in spite of the fact that I'm not in custody, a lawyer had made a special appearance to test the timeliness of the indictment when it was filed, and the court had accepted that and had ruled, the court would have said, well, of course it's timely. It's punishable by death, and there's no statute of limitations, so it's timely. But then it became untimely afterwards. Is that a sensible argument? Your Honor, I think the jurisdictional threshold is a sensible argument here, and it's the jurisdictional threshold that we can't get past, even if there's an indictment on the books. There's an additional problem which actually affects only one of the charges here, but does affect it. And that is that if, in fact, the agreement not to sentence him to death changes the statute of limitations, then one of the crimes on the basis of which he would be extradited is no longer a crime. So how could he be extradited? So there's something very strange about saying that that agreement under extradition can remove the grounds for extradition. Now, again, here there are two, and one would stand. But just logically, it makes the argument that somehow what is going on in this agreement is something that can change the statute of limitation a bizarre argument. It is a little bizarre, Judge. I'll grant you that. But I think the reason it's interesting and plausible, more plausible even than the court found in Guerrero with respect to the argument that's no longer before the court, is that, I mean, if you have an indictment alleging various offenses and then it comes time to prosecute them and it turns out that there is some prohibition that is discovered after the fact, after the indictment, the government could well decide to scale down its charges and talk to a defendant about guilty pleas or anything else. In respect to different arguments, it wouldn't make the offense go away. It wouldn't make the prosecution necessarily go away. There would have been things that could have happened had this issue actually been raised even after his extradition. And that's the point here is did counsel omit? What would the authority of the United States, I don't know who it is, is it the Secretary of State? Whoever it is who negotiates for the extradition and demands the extradition, it would put you in a rather strange position. You'd say, here we've got this murderer who has been indicted for murder, and he's been indicted on a death penalty charge. And you're saying that the United States, in asking for his extradition and in agreeing with the foreign government that it will not enact the death penalty, is agreeing that it can't prosecute him. What's the point of getting him extradited? Getting the extradition means I've just given up the right to prosecute him because by agreeing not to execute him, I've also agreed not to prosecute him. Well, Your Honor, if this had been a RICO case, for example, and the five-year limitations period had passed, and there were underlying murders, that would still be the same problem. I mean, this is something that does happen with... Isn't the reasonable way, in fact, to look at this sort of thing is to say that, of course, you can make part of the extradition contract any number of things. So it would be quite possible for Colombia and the United States to agree that he will be extradited only on count one and not on count two, or that a statute of limitations will... We will agree not to argue that this has passed. That is, any number of things can be put into the agreement without changing the statute of limitations. And instead, in effect, what you're saying to us is that we should imply in the agreement an agreement to change a statute, even though that is not made. And that, again, seems to me an incorrect way of looking at what is a contract. Your Honor, I agree with that generally. The statute of limitations statute, though, speaks about an offense being punishable by death as having no limitations period. If it's not punishable by death, then it has a limitations period traditionally in every other case. But his actions were punishable by death. That is... He was charged. Yeah. What he was charged with, if found, were punishable by death. There are any number of reasons why that may not be acted on. The prosecution may agree not to. The State Department may agree not to. But the underlying behavior is, under the law, some behavior that, if found, and if prosecuted in that way, is punishable by death. And that's the problem, Your Honor, is that it couldn't have been prosecuted in that way if the argument had been raised in the district court, after his extradition, say, and the government said, yes, this is potentially a problem. Let's modify the indictment charges to something we can still prosecute. Let me ask you a hypothetical question. Sure. Suppose you have a defendant who has been charged with murder, one count, punishable by death. Okay. And he has long been in hiding. No one knows where he is. Ten years later, he negotiates with the government. Let's say he's in a foreign country or he's just in hiding. But he negotiates with the prosecutor and says, I will give myself up if you agree not to put me to death. Is that in the United States, Your Honor, or outside? It doesn't matter. Either way. For my argument, it matters. He negotiates himself, and the prosecutor says, fine, fine. We'll promise you. We'll enter into a contract with you. We won't put you to death. And your side of the bargain is you surrender to the marshals. And he surrenders to the marshals. The contract is made. He surrenders to the marshals. And then he says, ha-ha, now you can't prosecute me. Statute of limitations is run. Your Honor, this sounds like a regular plea negotiation situation. I think it does make a difference because the government presumably had a timely indictment at some point. It did. But according to you, it became untimely. Well, you're saying it was less. According to you, it became untimely when the government made a contract with him saying, okay, we won't put you to death. But that's a territorially closed argument that allows. I'm sorry. No, let me put it a different, another side, instead the opposite. This agreement is made. But before extradition, he escapes. And while he's out there, some people seize him for whatever reason and bring him to the United States. So he is in the United States after this agreement was made. And is here but not under the agreement. He's then charged but taking into account the fact that this agreement existed and so on. He's not charged with the death penalty. But at that point, surely he is subject to it. And yet this agreement didn't make any change whatever then. But the agreement also didn't afford the United States a basis to exert its jurisdiction over him. Somebody else brought him back. So he's back in the United States, you know, of somebody's accord other than the government that was protecting him. And at that point, I wouldn't say this argument applies at all. But in this particular case where the only basis for the extradition foreclosed, it made the offense an offense not capital. And I don't think it precludes all prosecution after that. But it made it not capital. And there should have been an argument raised by trial counsel prior to his trial proceeding just to raise this. Because it's an interesting issue. And you think it was below a reasonable standard of competence to make this argument? I think when you get to statute of limitation type arguments, I mean, based on the court's holding in Hansel, if there's any colorable basis for it, you should always make it. Because it's always going to be prejudicial if it's successful. It's a worthwhile argument to make when it's over five years between the offense and the charges. But beyond that, Your Honor, I do want to say a little bit about the plea agreement. We've kept you. Yeah, but why don't you talk a minute more about the plea agreement? I was interested in the fact that Rodriguez and his counsel didn't use an interpreter to the counsel table. Exactly, Your Honor. They did. Oh, between the two of them. At the counsel table during the course of trial. But they did have an interpreter throughout the trial, Your Honor. Yes, but not giving the testimony, but for their own communications at the counsel table. I understand they did not have an interpreter. That was what the record suggested. Yes, Your Honor. And so I had difficulty understanding why it was clearly erroneous for the district court to conclude that the counsel was wrong in saying that Rodriguez did not understand or that he did understand the plea offer and the advice and gave a knowledgeable answer. Well, first, Your Honor, I don't think the district court actually made a finding at the end, at the time of the original appointment of counsel and, you know, me. And the hearing granting. The court thought at that time that there was a problem with the record as far as the probation officer, for example, had an interpreter during the pre-sentence investigation, and that conflicted with trial counsel's, at that point, brief response to the court's request for information about what he said about the plea agreement to his client. What we have here is a lot of objective indicators. I mean, I don't know, frankly, I wasn't at the trial, and I don't know what trial attorneys typically do at a trial as far as chatting with their clients. There was one Post-it note that counsel was able to produce from his records. Now, this is in contrast to another client who asserted that he didn't understand without the assistance of an interpreter, and the same attorney was able to produce, I think, 600 pages of his notes in correspondence with the client and things done with an interpreter that showed full well that that client had a basis to understand. This is someone who lived in. . . In this case, didn't, in the end, the district judge believe counsel when counsel said he understood and regardless of whether normally, whether you should have an interpreter, whether it failed, Strickland won not to get an interpreter and so on, but that in this case, the guy understood and made clear to me that he would not accept something which was more than 8 or 10 years, and if that is so, don't we again have a problem with the second prong of Strickland that even though he should have gotten maybe an interpreter and that that was a failing, it wouldn't have made a difference because we have this finding, a very strong credibility finding on the part of the district judge that this guy knew and chose otherwise. Well, Your Honor, we're asking that the court look at that. . . I respect the judge's credibility finding. I heard what he said. I don't know that he had, he could make a credibility finding that counsel had the competence to say whether a Spanish-speaking client understood what he was saying any more than, you know, what . . . He had communicated with over . . . With an interpreter, Your Honor, with an interpreter. I'm talking about at the counsel table. We don't know that what communications, if any, took place. The lawyer said that all my communications with him, we didn't, I communicated him effectively without an interpreter. He said he thought he recalled, he knew that he had an interpreter with him for every visit, that he went to the Penns or to the MDC. Absolutely, he did not have. I don't actually recall him talking about communications at counsel table apart from that post-it note, Judge. He talked about communications with his client at jail. And for every visit at jail, but for the one where he brought the plea agreement in English and left it with his client after a five to ten minute, this is a 30-year offer, take it or leave it, I'll see you tomorrow. But for that one, he had an interpreter with him every time. He kind of suggested that maybe it was to, you know, translate extradition documents. I think that's kind of unlikely. And if you look at the record as a whole, and that's what we are asking this Court to do, is look at some of counsel's failed recollections against the record as a whole. And some of them should not have been credited quite as strongly as the district court did just because they conflict. Thank you. You have two minutes for rebuttal. Thank you. I apologize for going over. We kept you. Mr. Metzner. May it please the Court. Carl Metzner. I'm Assistant United States Attorney in the Southern District of New York. I represent the United States in connection with this appeal. The defendant's 2255 motion was properly denied, both because his murder charges carried no statute of limitations and because his defense counsel communicated to him the essential terms of the plea offer, which he categorically rejected based on previous discussions that had been held between the defense counsel and his client. As the Court noted moments ago, the Guerrero opinion squarely forecloses the issue that's actually presented in Part 1 of the Certificate of Appealability here, specifically holding that 848E, while it provides for a penalty of death, does not mean that the death penalty has to actually be sought. It simply has to do with the gravity of the offense. As both Guerrero and Payne before it reiterated clearly, the gravity of the offense is what dictates the applicability of the statute of limitations, not the penalty actually sought. As the colloquy between Your Honors and my counsel . . . I think your overstating is slightly saying that it squarely precludes it because this is a slightly different factual circumstance than the ones that were either present or were discussed because the prior authority said, regardless of whether the prosecutor actually seeks it or whether it's . . . But this is a case your adversary argues where the government was legally precluded from seeking the death penalty. I don't think, as I've indicated earlier, that's a persuasive distinction, but it's not squarely covered by the prior authority. When I say squarely covered, Your Honor, I mean that the statute that was charged, the 848E1, is precisely the statute that we are discussing here. The very same charge, the very same argument as to whether the underlying drug felony statute of limitations, which is five years, should apply or whether the no statute of limitations should apply. And that was decided by this Court in Guerrero, which is why I say it's squarely resolved. With respect to what I consider to be a distinction without a difference that counsel is pressing, having to do with the jurisdictional type of arguments, I would note that in the Payne case, this Court made it clear that in relying on authority from multiple other circuits that held that during the window of time, the 20-year window of time when the federal death penalty had been declared unconstitutional, nevertheless, murder charges brought during that window, which at the time they were brought, if they were more than five years after the offense, by definition could not result in the imposition of the death penalty because of its unconstitutional designation, nevertheless, did not have a statute of limitations. The 4th, 8th, and 9th circuits had all held as such. This Court quoted and cited those opinions in the Payne decision in 2010, pointing out that it does not matter whether the death penalty was itself available for the offense and the reason why it's unavailable similarly does not matter. Whether it's because of the choice of the prosecution or the extradition agreement between the countries, it is the gravity of the offense that Congress was focused on when deciding that any murder charge punishable by death or any charge punishable by death could be returned without limitation. With respect to the request that this Court expand the certificate of appealability, as tempting from my perspective as that is given how clear I think the answer to the question is, I would ask the Court not to do that because this... It surprises me. It would seem to me that the government would be happy to have us expand the certificate of appealability and then write a published opinion which settled this question so that it would not come up again. I was quite puzzled by, you know, we might well not want to expand the certificate of appealability because then we can write a summary order. Well, Your Honor, that to me falls into the category of no good deed goes unpunished because how that opinion would be interpreted would be to ignore the holding that resolved the question but for defense counsel to then cite that they could seek review in this Court of matters that were not presented by the certificate of appealability and cite this opinion as the Court recognizing... That has always been the case that we can expand it. It's always been... We don't often do it but we can expand the certificate. There's nothing new. We wouldn't have to write an opinion to explain why we were doing it. You certainly can, Your Honor, and of course the Court has the authority to do it but I believe in the few circumstances when it's been done, it is at least limited to matters that were presented to the district court below and perhaps not included in the original certificate of appealability. Here, we would be talking about a completely new matter that was not presented to the district court below. That would set, I believe, a dangerous precedent in this court for litigants to come before you and say a COA should be amended to address an issue that was never presented to the district court. That, I believe, would undermine the structure of the certificate of appealability process. So as I said, while I think it's quite clear that the substance of the argument fails and as you said, Your Honor, an opinion stating that would be useful to resolve this issue were to ever come up again, the mischief that is inherent in doing so for future 2255 COA issues, I think, would counsel against doing so. As to the communication of the plea offer, Your Honor, as the Court has noted, Judge Grezze held a hearing after getting the affidavit from the defense counsel finding I need to know more about the circumstances of how this information was communicated. That hearing exhaustively discussed the communication of the offer. I was struck, though, by the district court's analysis. I mean, he credited Ordon's testimony about Rodriguez's English language ability at the time of conviction, but the Board of Prisons report, Rodriguez's other lawyers, the continual use of the interpreter, although I understand you might have an interpreter present even if you spoke the language very well, just to make sure there were no technical concerns or that the communication was precise. But still, all the other evidence seemed to go the other way. Why wasn't it clearly erroneous for the judge to find that the communication of the plea offer, which was so important, was adequate? Your Honor, I disagree that all of the other evidence went the other way because I think the issue here is whether he was able to communicate with him in English, not having to do with his English fluency, but whether Mr. Ordon, at the time he was raising the core terms of the government's plea offer, which was a guideline range in the neighborhood of 30 years, whether that factual information could be conveyed to him in English. Didn't his advice have to be conveyed to him also about why it was a good deal, what his exposure was? That had been done on multiple occasions, as the court noted, with an interpreter. As the record shows, there were multiple visits that Mr. Ordon made to the prison with an interpreter in which he repeatedly discussed the strength of the government's case and the advisability of working out some sort of a deal and talking about how when Mr. Rodriguez had originally said, I won't plead to anything more than eight years, how he had told Mr. Rodriguez that that was ridiculous because of the, quote, horrendous facts of this murder case, that no such plea offer would ever come. That was the factual background that led to the meeting just before trial where, yes, he communicated the plea offer without the assistance of an interpreter. So— Furthermore, wasn't it the substance of counsel's testimony that the defendant really refused to discuss the subject and just said eight years is my maximum, punto, that we're nothing more to discuss? I'm not interested in such a plea agreement? That's exactly right, Your Honor. As soon as Mr. Ordon said 30 years, the operative term of the plea agreement, he testified that Mr. Rodriguez wanted no further discussion about it, that he, quote, shut down the discussion. That's why, as Mr. Ordon said, that Columbus Day meeting that occurred the day before trial was so short because Mr. Rodriguez was done having that discussion. He was able to understand the key term of the plea agreement. Mr. Ordon left the written plea agreement in English, not translated, but left the plea agreement with Mr. Rodriguez, giving him the opportunity to raise the issue again, which they had the chance to do the next morning outside the courtroom while they— As a matter of interest, did the plea agreement, when it had 30 for years, have it in letters or in numbers? In letters or in numbers? I'm sorry, I don't understand, Your Honor. Well, did it say 30 or did it say 30? It said neither, Your Honor, and let me explain. It was in months and it was in numerals. It was 324 to 405 months, which is 27 years. Was that in numerals or in letters? In numerals, Your Honor, and that's in the record. The 327 number is 327. The funny thing about numerals is it's like ancient Chinese script, which Japanese could read even though they don't speak Chinese because the scripts were the same in the two. Numerals are the equivalent for us in different languages. I write 30, somebody understands it. I write 30 or say 30, a person who doesn't speak English doesn't understand it, so I'm interested if the numbers were there, and you say they were. They were, Your Honor. It was both numbers and words because it's 320, but then it's followed by the word months, right? Correct, Your Honor, it is, and, of course, there are words all around it. Twenty years might be quite a different thing. And to be clear, Mr. Ordon testified that he basically said it was around 30. Now, the numbers I just recited, the low end is 27 years, the high end is 33 and three-quarters, and he never got any farther. That was his testimony. He never had the opportunity to go any farther because Mr. Rodriguez was not interested. I would point out one thing to answer a question Your Honor had a moment ago about the presence of an interpreter at the counsel table during the trial. Mr. Ordon specifically remembered there was no interpreter. That's on page 113 of the appendix. Unless the Court has further questions, we'll rest on our feet. Did Ordon say anything whatsoever about whether they communicated at counsel table? He did in that same colloquy, Your Honor. I'd have to go back to the quotations, but it's in that section of the appendix where he's testifying about the presence of an interpreter, the lack of the presence of an interpreter and his communications with his client. He said that they did communicate. I believe that's correct, Your Honor. It's page 113 of the appendix. He was asked, Why didn't you have one here? And he says, Because he spoke English and he wrote English. Thank you very much. Ms. Hind, you have two minutes for rebuttal. Thank you, Your Honor. Your Honor, I mean, counsel just made the point repeatedly that Mr. Ordon's testimony was that Mr. Rodriguez shut down the conversation the minute the 30-year estimate was given to him along with the English plea agreement. The fact that counsel admitted not giving any additional advice at that time, when there was a plea agreement that was prospectively helpful to Mr. Rodriguez, he didn't give him advice about comparative sentencing exposure, for example. Ms. Hind, do you agree that there had been previous discussions with the benefit of interpreter about the possibility of a plea and the exposure at trial, or do you reject that? Mr. Ordon testified that he believed that he didn't really have any records or he didn't have any notations or anything else. He believed it. He believed it, but he also believed that he asked the government for the plea agreement, and there was no record of that. He believed a lot of things that were kind of self-serving, because I'm sure he would like to believe that he did the right thing, and I don't fault him for whatever he did or didn't do, except to the extent that he didn't keep records in this case, and he does tend to have a ---- But he testified, though, didn't he, that he was so concerned that he pressed the government to give him a plea agreement. But he was not sure that ---- No, he wasn't sure of that, Your Honor. He testified on the day of the holiday weekend, and he went in on the holiday. Well, he would have had to, Your Honor, because the day after the holiday was jury selection and the plea agreement would have been withdrawn at that point. He wasn't sure. His recollection was, as the district court found originally, fuzzy. Mr. Ordon testified that by the time he was appointed to represent Mr. Rodriguez, he had represented at that point, quote, unquote, hundreds and hundreds of defendants. And whether he was confusing Mr. Rodriguez with somebody else, he only met with him approximately six times, according to BOP records, from the time of his appointment through the time of trial. At one point, the district court had to instruct Mr. Ordon to sit down and have a comprehensive meeting with his client because their meetings were pretty perfunctory and hadn't satisfied Mr. Rodriguez that he knew what was going on. There wasn't, by the way, evidence other than the fact that Mr. Ordon and Mr. Rodriguez sat at counsel table without an interpreter that there were communications at that point any more than there were many communications prior. And those are all factors that I would ask that the court look carefully at what he said because he often didn't recall, but he would have liked to believe that he had. And I don't think that's a basis for credibility. Thank you very much. Thank you for your arguments. Yes. Yeah, well argued. Well argued. We will reserve decision.